UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CHARMAINE JONES, | CASE NO. 1:21-CV-01257-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

INTRODUCTION

Plaintiff Charmaine Jones filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision to deny disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On June 29, 2021, pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. (Non-document entry dated June 29, 2021. On January 25, 2022, pursuant to 28 U.S.C. § 636, the parties consented to my jurisdiction. (ECF #10). Following review, and for the reasons stated below, I conclude that the Commissioner's decision should be **AFFIRMED**.

PROCEDURAL BACKGROUND

Ms. Jones filed for DIB on January 2, 2017, alleging a disability onset date of May 31, 2016. (Tr. 141-42). Her claim was denied initially and on reconsideration. (Tr. 75, 89). She then

1

requested a hearing before an Administrative Law Judge. (Tr. 107-08). Ms. Jones (represented by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on June 14, 2018. (Tr. 30-61). On September 25, 2018, the ALJ issued a written decision finding Ms. Jones not disabled. (Tr. 15-23). The Appeals Council denied Ms. Jones' request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981).

Ms. Jones filed a Complaint in this Court on May 14, 2019. (Tr. 525, 533). This Court found error where the ALJ failed to provide good reasons for giving a treating physician's opinion less than controlling weight and failed to provide sufficient explanation to permit meaningful review. Accordingly, the Court reversed the Commissioner's decision and remanded for additional proceedings. *See Jones v. Comm'r of Soc. Sec.,* No. 1:19-cv-1076, 2020 WL 870939 (N.D. Ohio Feb. 21, 2020).

Ms. Jones filed another application for DIB on April 26, 2019. (Tr. 606). On June 3, 2020, after this Court reversed and remanded the case for additional proceedings pertaining to the prior application, the Appeals Council directed the ALJ to consolidate the claims files, offer Ms. Jones an opportunity for a new hearing, and issue a new decision on the consolidated claim. (*Id.*).

Thereafter, Ms. Jones' consolidated claim was denied on initial review and on reconsideration. (Tr. 551, 571). She then requested a hearing before an ALJ. (Tr. 628-29). Ms. Jones (represented by counsel), and a VE testified at a hearing before the ALJ on October 21, 2020. (Tr. 474-502). On December 11, 2020, the ALJ issued a written decision finding Ms. Jones not disabled. (Tr. 448-64). The Appeals Council denied Ms. Jones' request for review, making the hearing decision the final decision of the Commissioner. (Tr. 421-24; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Jones timely filed this action on June 29, 2021. (ECF #1).

FACTUAL BACKGROUND

## I.  PERSONAL AND VOCATIONAL EVIDENCE

Ms. Jones was 60 years old at the time of her alleged onset date, and 65 years old at the time of the second administrative hearing. (Tr. 536, 475). Ms. Jones completed high school. (Tr. 37). In the past, Ms. Jones has been employed as an Administrative Assistant. (Tr. 75).

## II.  RELEVANT MEDICAL EVIDENCE

Ms. Jones has suffered from chronic back pain for many years. (*See* Tr. 362) ("She was seen by me in 2001-2005 for pack pain/myalgia/hip bursitis"). On October 21, 2015, Ms. Jones told Amanda Corniello, CNP, that she had severe (ten out of ten) back pain that got worse over the prior four days. (Tr. 237). Ms. Jones said her pain did not radiate, but it was aggravated by bending, twisting, and certain positions. (*Id.*). She denied any numbness, headaches, abdominal pain, pelvic pain, leg pain, tingling, weakness, or paresthesias. (*Id.*). On examination, NP Corniello noted Ms. Jones had normal range of motion in her neck; normal cardiovascular and pulmonary functions; and normal sensation, strength, and reflexes. (Tr. 238). However, Ms. Jones's stance and gait were abnormal. (*Id.*). NP Corniello diagnosed Ms. Jones with back pain without sciatica and recommended moist heat, prescribed a Medrol dose pack, and gave Ms. Jones an injection of Toradol, a muscle relaxant. (Tr. 238-39).

On October 29, 2015, John Jewell, M.D., treated Ms. Jones for bilateral pain in her knees, ankles, elbows, and lower back that does not radiate down the legs. (Tr. 231). Ms. Jones reported feeling that the pain was gradually building. (*Id.*). She hurt herself while cleaning on October 18, 2015. (*Id.*). She also reported sharp stomach pain with bowel movements and alternating constipation/diarrhea. (*Id.*). A CT scan showed Ms. Jones had a small hiatal hernia, mild heart

3

enlargement, osteopenia and multilevel degenerative changes in her spine, and degenerative joint disease in her bilateral hips. (Tr. 231-32). Physical examination revealed "slight lumbar paraspinal muscle tenderness" and good range of motion in her knees, hips, and ankles, without tenderness to palpation. (Tr. 233). Dr. Jewell diagnosed Ms. Jones with pain in multiple joints and alternating constipation/diarrhea. (*Id.*). He ordered lab work, suggested Tylenol Arthritis, and prescribed hydrocodone to use for more severe pain, noting that Ms. Jones was not a good candidate for NSAIDs due to gastric bypass. (*Id.*).

On February 5, 2016, Ms. Jones saw William Damm, M.D., for a physical examination. (Tr. 226). Dr. Damm noted that Ms. Jones had a history of osteoarthritis, migraine, major depressive disorder, obesity, mild obstructive sleep apnea, and macular edema. (*Id.*). Ms. Jones complained only of feeling depressed. (Tr. 227). On examination, Ms. Jones was alert and oriented. (Tr. 228). Dr. Damm prescribed medication for Ms. Jones's major depression, seasonal affective disorder, and overactive bladder. (Tr. 228).

On August 30, 2016, Ms. Jones reported to Karen Bond, PA-C, of having back pain and spasms after bending forward to clean a toilet the previous day. (Tr. 219). She reported a history of similar episodes of acute back pain. (*Id.*). She rated her pain as a 7 to 8 out of 10, and denied radiating pain, weakness, numbness, tingling, and leg pain. (*Id.*). Ms. Jones also reported feeling depressed. (Tr. 220). On examination, Ms. Jones had mild pain to palpation in the lumbar spine, tenderness over the right sacroiliac joint, limited flexion of the spine, and muscle spasms. (*Id.*). She displayed normal gait, normal strength, and normal sensation in her lower extremities, and no joint swelling, deformity, or tenderness. (*Id.*). PA Bond diagnosed Ms. Jones with "acute midline

4

low back pain without sciatica," for which she gave Ms. Jones an injection of Toradol, and prescribed methocarbamol (Robaxin), and ibuprofen 800 mg every eight hours. (*Id.*).

On September 8, 2016, Ms. Jones saw Daniel Adams, PA-C, and reported worsening of low back pain, which caused difficulty walking, and was aggravated by sitting. (Tr. 218). Ms. Jones did not feel the Toradol helped her pain, and the Robaxin, ibuprofen, ice and heat, and Norco provided little relief. (Tr. 218). Ms. Jones rated her pain as a 10 out of 10, and reported the pain radiated to her right leg, causing numbness and tingling, and she felt a tightening/pinching in her left buttock. (*Id.*). On examination, Ms. Jones was in mild distress and had a reduced ability to rise from squatting. PA Adams noted normal heel-walk and toe-walk, a guarded posture, decreased range of motion with pain on flexion and extension and right rotation, 5/5 strength in the lower extremities, and pain with leg raises on both sides. (Tr. 218). PA Adams diagnosed Ms. Jones with acute low back pain with right-sided sciatica. (Tr. 219). He gave Ms. Jones an injection of Toradol and prescribed Flexeril and Deltasone. (*Id.*).

On September 26, 2016, Dr. Damm noted that Ms. Jones had frequent urination and joint pain in her toes. (Tr. 216-17). Dr. Damm ordered an erythrocyte sedimentation rate test, a rheumatoid factor test, and a CCP antibody test. (Tr. 217). The rheumatoid factor test was abnormal, showing a high value. (Tr. 247).

On January 11, 2017, Ms. Jones saw Dr. Jewell for a wellness visit. (Tr. 292). Ms. Jones reported struggling with more arthritis pain located in her low back, neck, left knee, and ankles. (*Id.*). Ms. Jones said ibuprofen helped some, but she must limit her use because of her gastric bypass surgery. (Tr. 292-93). She reported pain and numbness in her left hand, and stated she wore a wrist guard at night. (Tr. 293). Ms. Jones also endorsed very fragmented sleep, frequent nocturia,

and fatigue. (Tr. 294-95). On examination, Dr. Jewell noted she had no tenderness in her spine, no abnormalities in her extremities, an antalgic gait, full strength/tone in her extremities, and intact sensation. (Tr. 295). Tinel and Phelan tests were negative bilaterally. (*Id.*). Dr. Jewell diagnosed Ms. Jones with major depression in partial remission, chronic pain in multiple joints, and nocturia. (Tr. 296). He continued Ms. Jones' medications, recommended she use ibuprofen sparingly, and referred her to rheumatology. (*Id.*).

In February 2017, Dr. Saghafi, a physician at Parma Neurology, performed a physical evaluation. (Tr. 351). Ms. Jones reported osteoarthritic pain made worse by doing household chores, back spasms, and increased pain within 20 to 25 minutes of standing or walking. (*Id.*). Dr. Saghafi opined Ms. Jones can lift and carry up to ten pounds and could bend, stand, and walk for up to twenty-five minutes. (Tr. 353).

On February 2, 2017, Mark Brejt, M.D., a radiologist, took x-rays of Ms. Jones' left knee and lumbar spine. (Tr. 360-61). Dr. Brejt determined there were no acute factures or dislocations in the knee or spine, but there was moderate loss of disc height at L4-L5 and L5-S1 levels, minimal anterolisthesis of L4 over L5, and hypertrophic changes involving the articular facets at those levels, with narrowing of the neural foramina. The sacroiliac joints appeared normal. (*Id.*).

On March 27, 2017, Ms. Jones met with rheumatologist Alla Model, M.D., for a consultation regarding her chronic pain. (Tr. 362). Ms. Jones endorsed fatigue, hearing loss, swallowing problems, dry mouth, shortness of breath, chronic cough, joint pain, morning joint stiffness, back pain, headaches, and dizziness. (Tr. 367-68). She denied abdominal pain, joint swelling, muscle weakness, numbness, tingling, and memory loss. (Tr. 367-68). On examination, Ms. Jones had no pain on palpation and displayed good flexion and extension in her back. (Tr.

369). She had no joint swelling, deformity, or tenderness; did not endorse tender points; and had a normal gait and normal and symmetric reflexes. (*Id.*). Dr. Model diagnosed Ms. Jones with low back pain and recommended aqua therapy. (*Id.*). Dr. Model ordered another rheumatoid factor test, which was again abnormal. (Tr. 380).

Lumbar X-rays from April 25, 2017, revealed severe degenerative disc disease at the L4-L5, mild degenerative disc disease at L5-S1, degenerative facet changes in the lower lumbar spine, and no abnormalities in Ms. Jones' knees. (Tr. 388-89).

On November 30, 2017, Ms. Jones told Jennalee Chagin, FNP-C, that she had throbbing/aching thumb pain and stiffness, sharp with certain movement. (Tr. 390). Ms. Jones reported the pain was better with extension and worse with flexion of the thumb. (*Id.*). She denied tingling, sensory change, and focal weakness. (*Id.*). Examination showed right hand tenderness with a normal (albeit painful) range of motion, strength, sensation, and capillary refill. (Tr. 391). NP Chagin suspected Ms. Jones had tendinitis and prescribed a three-day mild prednisone burst, recommended gentle range of motion as tolerated, and referred her to the orthopedic department. (Tr. 391).

On May 25, 2018, Ms. Jones saw Dr. Damm for chronic ear pain and right shoulder pain and severe upper arm pain with limited range of motion and inability to lift for two weeks. (Tr. 397). Ms. Jones also endorsed back pain, joint pain, myalgias, and feeling nervous/anxious. (*Id.*). On examination, Dr. Damm found Ms. Jones was oriented and in no distress, had decreased range of motion, tenderness, bony tenderness, and pain in her right shoulder, without swelling or spasm. (Tr. 398). Dr. Damm diagnosed Ms. Jones with chronic pain in multiple joints, osteopenia, tinnitus, recurrent major depression, chronic anxiety, and acute pain in her shoulder. (Tr. 400).

7

Dr. Damm adjusted her medications for depression, tinnitus, and anxiety; ordered lab work for her joint pain and a shoulder x-ray; and referred her to physical therapy for her shoulder. (Tr. 400). The shoulder x-ray showed no evidence of fracture, dislocation, spurring, or narrowing of joint spaces. (Tr. 412). The results of the rheumatoid factor test were again abnormal. (*Id.*).

On June 6, 2018, Ms. Jones saw Dr. Model again, who was unable to diagnose rheumatoid arthritis because of her borderline rheumatoid factor test results. (Tr. 845). He diagnosed chronic pain syndrome and referred Ms. Jones to chronic pain rehabilitation. (*Id.*).

On June 11, 2018, Ms. Jones attended a physical therapy evaluation for her right shoulder. (Tr. 839). She was noted to be limping that day due to pain in her right knee. (Tr. 840).

On June 18, 2018, Ms. Jones saw Matthew McDonnell, M.D., for tinnitus, diminished hearing, and balance issues. (Tr. 837). Dr. McDonnell diagnosed her with bilateral tinnitus, sensorineural hearing loss, and dizziness and giddiness. (Tr. 838). Due to the sensorineural asymmetry in the left ear, Dr. McDonnell ordered an MRI. (*Id.*).

On June 25, 2018, Ms. Jones saw Dr. Damm and complained of right knee pain, progressively worsening since June 11th. (Tr. 834), She reported pain and pinching from the right buttocks into the right thigh and numbness down to her toes. (*Id.*). Tramadol, oxycodone, ibuprofen, and ice were minimally effective for pain relief. (*Id.*). Physical examination revealed normal extremities except for visible varicosities on the bilateral thighs, normal range of motion in the hips, knees, shoulders and spine, without swelling, deformity, or tenderness. (Tr. 835). She had pain to palpation over the posterior, lateral, and anterior knee, and pain during the Lachman's test. (*Id.*). Gait was normal and sensation was grossly intact. (*Id.*). Dr. Damm prescribed meloxicam and referred Ms. Jones to physical therapy to address knee, back, and joint pain. (Tr. 836).

On October 5, 2018, Ms. Jones met with John Bartholomew, M.D., for her varicose veins. (Tr. 829). She endorsed right leg pain located at the posterior part of her calf and thigh. (*Id.*). Dr. Bartholomew observed varicose veins in both legs, more on the right lateral calf and thigh. (Tr. 830). He noted normal range of motion in her hips, knees, shoulders, and spine, and also noted joint swelling and tenderness. (*Id.*). Ms. Jones explained she had a venous ultrasound that did not reveal a DVT but did show a Baker's cyst. (*Id.*). Dr. Bartholomew indicated this could explain her knee pain. (*Id.*). Imaging of Ms. Jones' deep and superficial leg veins revealed a Baker's cyst in the right leg, valvular incompetency in the common femoral vein and great saphenous vein on the right, with varicosities in the lateral thigh extending over the knee into the lateral calf, and valvular incompetency in the common femoral vein on the left. (Tr. 826).

On November 20, 2018, Ms. Jones met with Mark Schickendantz, M.D., for right shoulder pain. (Tr. 821). Physical examination revealed normal ambulation and, relevant to her right shoulder, painful range of motion testing with a positive Hawkins test, and normal rotator cuff strength with some giveaway in abduction. (Tr. 824). After review of Ms. Jones' shoulder x-ray, Dr. Schickendantz diagnosed impingement syndrome of the right shoulder, gave Ms. Jones a shoulder injection, and instructed her to take a few days off of physical therapy to allow her shoulder to settle down. (*Id.*).

On April 26, 2019, Ms. Jones saw Pamela Moser, PA-C, for wrist pain and decreased range of motion, explaining she tripped the day before and fell on her outstretched wrist. (Tr. 810-11). Physical examination revealed decreased range of motion, tenderness, swelling, and deformity in the left wrist and hand, and decreased grip strength. (Tr. 811). X-rays revealed no acute process but showed a 1-millimeter bony density lateral to the ulnar styloid, likely a tiny ossicle. (*Id.*, Tr. 1161).

PA Moser recommended Ms. Jones wear a wrist brace while up and active and use ibuprofen and Tylenol for pain. (*Id.*).

On June 25, 2019, Ms. Jones underwent a psychological evaluation conducted by Thomas Evans, Ph.D. (Tr. 1192). When summarizing her work history, Ms. Jones reported getting along with fellow coworkers and with people in general. (Tr. 1193). Ms. Jones felt her psychiatric symptoms resulted in difficulty staying on task. (*Id.*). In a typical day, Ms. Jones performs household chores, run errands as needed, exercise, cook meals, and goes to bed by 9:00 p.m. (*Id.*). Dr. Evans noted Ms. Jones ambulated without difficulty and sat comfortably in her chair throughout the evaluation. (Tr. 1194). Ms. Jones endorsed ruminating over little things, interfering with her sleep. (*Id.*). Ms. Jones reported being depressed most of her life and rated her depression as an eight on a scale of one to ten. (*Id.*). She described symptoms including depressed mood, fatigue, no motivation, and feelings of low self-worth. (*Id.*). She reported crying episodes a few times a week and claimed to be irritable. (*Id.*). Ms. Jones also reported having panic attacks four times in the past two months. (*Id.*).

Dr. Evans described no limitations in Ms. Jones' ability to understand, remember, and apply information; maintain attention and concentration, persistence and pace, to perform tasks; and respond appropriately to supervision and coworkers in a work setting. (Tr. 1195-96). When assessing her limitations in responding appropriately to work pressures, Dr. Evans noted Ms. Jones' reported mood symptoms affecting her productivity and ability to stay on task. (Tr. 1196).

On October 30, 2019, Ms. Jones was again evaluated by consultative examiner Dr. Saghafi. (Tr. 1281). Ms. Jones reported diffuse pain in her joints, starting in her low back, radiating up to her neck and out into her limbs. (*Id.*). She described the pain as debilitating and accompanied by

10

spasms that prevent her from performing activities. (*Id.*). She spent most of the time lying with ice packs, and was often "laid up" for approximately two days a time (*Id.*). Physical examination was normal with the exception of brisk reflexes in the upper and lower extremities, with two beats of unsustained clonus bilaterally at the ankles. (Tr. 1283). Dr. Saghafi opined Ms. Jones was able to lift, push, and pull sufficiently to perform activities of daily living, can lift up to ten pounds, and is able to bend, walk, and stand for up to ten minutes. (*Id.*).

## III.  OPINION EVIDENCE

**John Jewell, M.D. (treating physician).** On April 5, 2017, Dr. Jewell completed a medical source statement, in which he opined Ms. Jones can occasionally lift zero to ten pounds; can stand and walk for a total of two hours in an eight-hour workday, and for fifteen to thirty minutes without interruption; can sit for four to five hours in an eight-hour workday, and one hour without interruption; and can rarely climb, balance, stoop, crouch, kneel, or crawl. (Tr. 383). Dr. Jewell supported these opinions with medical findings, including pain in Ms. Jones' low back, neck, left knee, and ankles; worsening pain with prolonged standing or walking; and joint stiffness and pain. (*Id.*). Dr. Jewell further opined Ms. Jones could rarely reach, push/pull, or perform fine or gross manipulations, all of which would increase her joint pain; should be restricted from heights and moving machinery; and requires the ability to alternate positions between sitting, standing, and walking, at will. (Tr. 384). Dr. Jewell determined Ms. Jones experiences severe pain that would interfere with concentration, take her off task, and cause absenteeism. (*Id.*). Lastly, Dr. Jewell opined Ms. Jones would need an unscheduled break for two to three hours in addition to regular breaks. (*Id.*).

11

**Leslie Green, M.D. (state agency medical consultant).** On June 4, 2019, Dr. Green reviewed Ms. Jones' records and performed a residual functional capacity assessment. (Tr. 546). Dr. Green opined Ms. Jones could lift and carry twenty pounds occasionally, ten pounds frequently, and could sit for about six hours and stand/walk for about six hours in an eight-hour workday. (Tr. 547). Dr. Green's opined limitations were based on Ms. Jones' musculoskeletal pain, varicose veins, and obesity. (*Id.*). Dr. Green determined Ms. Jones could climb ramps and stairs, balance, stoop, kneel, crouch, and crawl frequently, but could never climb ladders, ropes, or scaffolds. (*Id.*). She concluded Ms. Jones should avoid excessively noisy workplace environments and concentrated exposure to extreme cold, vibration, and hazards such as machinery and heights. (Tr. 548). Dr. Green considered Ms. Jones' pain while assessing the RFC and noted Ms. Jones' noncompliance with physical therapy for joint pain. (Tr. 549).

**Angela Bucci, D.O. (state agency medical consultant).** On November 13, 2019, Dr. Bucci reviewed Ms. Jones' records and performed a residual functional capacity assessment. (Tr. 566). Dr. Bucci noted the medical evaluation showed normal strength, sensation, and gait, and affirmed the RFC assessed by Dr. Green. (Tr. 568).

**William Damm, M.D. (treating physician).** On July 17, 2020, Dr. Damm completed a medical source statement, in which he opined Ms. Jones can lift ten pounds occasionally, five pounds frequently; can stand and walk for a total of one hour a day; can sit for a total of four hours a day, two-and-a-half hours without interruption; can never climb, balance, stoop, crouch, kneel, or crawl; can occasionally reach and perform fine and gross manipulation, and rarely push/pull; should be restricted from heights, moving machinery, and temperature extremes; and requires the ability to alternate positions between sitting, standing, and walking, at will, and

requires the ability to elevate her legs at will to a forty-five degree angle. (Tr. 1291-92). Dr. Damm reported Ms. Jones experiences severe pain that would interfere with concentration, take her off task, and cause absenteeism. (Tr. 1292). Finally, Dr. Damm determined Ms. Jones would need an additional unscheduled two- to three-hour break in addition to regular scheduled breaks. (*Id.*). In support of his conclusions, Dr. Damm referred to Ms. Jones' lumbar disc disease at L4-L5 and her generalized osteoarthritis affecting multiple joints. (Tr. 1291).

## IV.  ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Jones, VE Dr. Robert Mosley, and VE Deborah Lee presented during the hearings before the ALJ.

At the first hearing on June 14, 2018, Ms. Jones testified she experienced consistent pain in her knee, arm, back, neck, and wrist, preventing her from working. (Tr. 38). *(Id.).* She stated she could only lift approximately two pounds and must do her chores in increments of 20 minutes. (Tr. 39, 43). She can only tolerate sitting for about 40 minutes because she gets very stiff; she must switch positions or limp around a bit before the stiffness dissipates. (Tr. 43). When asked if she could return to her past work as an administrative assistant, Ms. Jones testified she cannot concentrate, is fatigued, and cannot perform the sitting and typing required of the job because of her wrist and neck pain. (Tr. 44). On a typical day, Ms. Jones does light chores and laundry, walks the dog for twenty minutes, makes meals, and, because of fatigue from difficulty sleeping at night due to pain, she rests during the day. (Tr. 40, 43). Ms. Jones reported switching primary care physicians, from Dr. Jewell to Dr. Damm, because Dr. Jewell was always booked and difficult to schedule with. (Tr. 52). She reported taking Luvox for depression, Xanax for anxiety, ibuprofen for

13

pain, tramadol for ten of ten pain, and trazadone as a sleep aid. (Tr. 53-54). Thirty tablets of Xanax typically last Ms. Jones about six months. (Tr. 53).

The VE classified all of Ms. Jones' past relevant work as Administrative Assistant (DOT 169.167-010, sedentary, skilled SVP 7). (Tr. 55-56). The ALJ asked the VE to determine whether a hypothetical individual could perform Ms. Jones' past relevant work if limited to light exertion and subject to the following restrictions: can occasionally climb ramps and stairs; never use ladders, ropes, or scaffolds; and occasionally balance, kneel, stoop, crouch, and crawl. (Tr. 56). The VE testified such an individual could perform the past relevant work. (Tr. 57).

The ALJ asked the VE whether a hypothetical individual could perform Ms. Jones' past relevant work if subject to the same limitations and was additionally restricted as follows: limited to simple, routine work and to simple tasks that are not fast-paced or have unusual production demands. (Tr. 57-58). The VE testified such an individual would not be able to perform the past relevant work. (Tr. 58).

Counsel for Ms. Jones asked the VE if, under the restrictions posed in the first hypothetical, such an individual could perform Ms. Jones' past relevant work if additionally limited to occasional fine and gross manipulation. (*Id.*). According to the VE, such an individual would not be able to perform the past relevant work. (*Id.*).

At her second hearing, on October 21, 2020, Ms. Jones testified that since her first hearing, she remains unable to work due to constant pain in her lower back, wrists, knees, and neck, limiting her ability to perform many activities of daily living. (Tr.482). Ms. Jones stated the pain also affects her ability to sleep, which causes her to take naps during the day lasting an hour to an hour and a half. (Tr. 482, 484). She testified her back pain limits her to standing and

14

walking no more than ten to fifteen minutes at a time and she needs breaks in between household chores after ten minutes of activity. (Tr. 482-83). For instance, she must ice her back and wrist or lie flat on the floor with her legs elevated after ten minutes of vacuuming. (Tr. 483). When preparing meals, she is limited to ten minutes of standing before pain radiates from her neck to her right shoulder and down to her wrist. (*Id.*).

Ms. Jones is able to walk for about ten minutes before she must stop to stretch her back to relieve pain and pressure. (*Id.*). Sitting aggravates her lower back and she can only do so for about ten minutes at a time before needing to stretch. (Tr. 484). Ms. Jones testified to being unable to stay in any position for prolonged periods, whether she is sitting, standing, or sleeping. (*Id.*). Ms. Jones' doctors told her the best position to relieve pressure is to lie flat on her back and elevate her legs. (*Id.*). Ms. Jones gets in this position up to four times a day for ten to fifteen minutes and then uses ice for additional pain relief. (Tr. 485).

The heaviest weight Ms. Jones can lift is five pounds. (*Id.*). Weakness in her wrists and pain in her shoulder keep her from lifting more weight. (Tr. 486). She needs two hands to lift a fry pan. (Tr. 483). In addition to using ice and elevating her legs, Ms. Jones uses heating pads on her wrist, neck, and low back. (Tr. 487). Movement aggravates Ms. Jones' pain. (*Id.*). She reported how cleaning up her garden (picking up small planters, emptying the soil, cleaning up the plants) took about an hour and a half because she needed to stop after twenty minutes and rest or ice her back. (Tr. 487-88). Ms. Jones explained she immediately got in a bath with Epsom salts and continued to ice her back even hours after that. (Tr. 488).

On a typical day, Ms. Jones gets out of bed, gets dressed, makes herself breakfast, and takes her medication. (Tr. 490). She may organize some paperwork, review her checking account, and

review the calendar. (*Id.*). She prepares lunch, plans for dinner, does laundry, reads or watches television, eats dinner, and usually prepares for bed around 8:00 p.m. to account for the long time it takes her to fall asleep. (Tr. 490-91). Ms. Jones drives once or twice a week, usually to get groceries. (Tr. 493). Ms. Jones enjoys sewing but is limited by wrist pain and the length of time she can sit before needing to move. (Tr. 495). She also enjoys reading, but finds she has memory retention issues. (*Id.*). She is re-reading a book for the fourth time and still picks up on things that she did not retain from the prior readings. (*Id.*).

When the ALJ commented on the lack of treatment records for 2020, Ms. Jones explained that COVID has kept her from receiving much treatment. (Tr. 491).

The VE then testified. The ALJ asked the VE whether a hypothetical individual could perform Ms. Jones' past relevant work if limited to light exertion and further restricted as follows: can occasionally use ramps and stairs, but never ladders, ropes, or scaffolds; and frequently balancing, kneeling, stooping, crouching, and crawling. (Tr. 498). The VE testified such an individual could perform Ms. Jones' past relevant work.

The ALJ asked the VE if, under the same restrictions identified, the hypothetical individual could perform Ms. Jones' past relevant work if further limited to the following: must avoid concentrated exposure to extreme cold; and must avoid excessively noisy workplace environments; and no exposure to hazards such as machinery or heights, but would be able to avoid ordinary hazards such as boxes on the floor, doors ajar, approaching people, and vehicles. (Tr. 499). The VE testified such an individual could perform the past relevant work. (*Id.*).

Building on the second hypothetical, the ALJ added other limitations, including occasionally lifting zero to ten pounds, standing/walking for two hours of an eight-hour workday,

and would require additional rest breaks (for two to three hours) outside of the standard breaks, and asked if such an individual could perform the past relevant work. (Tr. 499-500). The VE stated the necessity for an additional two- to three-hour break would eliminate past work and all employment. (Tr. 500).

Referring the VE back to the first and second hypothetical, the ALJ added a limitation to simple, routine, and repetitive tasks and asked if such an individual could perform Ms. Jones' past relevant work. (*Id.*). The VE testified such an individual could not perform the past relevant work because simple, repetitive tasks are for unskilled work. (*Id.*). There is no transferability from skilled work to unskilled work. (*Id.*).

The VE testified being more than twenty percent off-task is work preclusive. (Tr. 501). Some employers tolerate up to one day per month in absenteeism, while others tolerate six to seven days per year. (*Id.*).

V.    OTHER RELEVANT EVIDENCE

**Function Report.** On May 28, 2019, Ms. Jones completed an Adult Function Report, claiming that her conditions cause constant, consistent, throbbing pain, spasms, and aches. (Tr. 738). She reports the pain keeps her from being able to rest, sit, stand, or lie down. (*Id.*). On a typical day, Ms. Jones gets dressed, makes the bed, does gentle stretching, performs grooming, does household chores, prepares meals, cleans and tidies up, and sews if her pain relents. (Tr. 739). The pain in her hips and legs wakes her from sleep. (*Id.*). Ms. Jones endorsed pain with bending over to put on socks or remove her pants, and she has to be cautious to use the rail when bathing. (*Id.*). She has been cutting her hair shorter to make care easier. (*Id.*). Bending over to shave her legs causes back pain. (*Id.*). She makes meals that take between five and twenty minutes to prepare

17

because she cannot stand for longer periods of time. (Tr. 740). Ms. Jones does household chores for no more than twenty minutes at a time and does not lift anything heavy. (*Id.*). Ms. Jones avoids yardwork unless she is prepared to take heavy medication and use ice packs afterwards. (Tr. 741).

Ms. Jones shops for food in stores and purchases everything else over her cell phone. (*Id.*). Her husband helps with the shopping, which takes no more than thirty minutes. (*Id.*). Ms. Jones endorsed needing to hang on to the cart. (*Id.*). Ms. Jones' conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, and use her hands. (Tr. 742). She can lift about five pounds, or a bag of flour and walk about nine-tenths of a mile or for about fifteen minutes before needing to rest for five minutes. Ms. Jones reported being unable to sit on high stools or chairs because it will cause her legs to go numb. (Tr. 743). Ms. Jones sometimes uses a cane and wears a wrist splint. (Tr. 744).

### THE ALJ'S DECISION

The ALJ's decision, dated December 11, 2020, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2. The claimant has not engaged in substantial gainful activity since May 31, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. Following his de novo review of the expanded record, the undersigned finds that the claimant's severe impairments since the May 31, 2016, alleged onset date are as follows: lumbar degenerative disc disease, degenerative joint disease in both hips, obesity/status post gastric sleeve surgery, varicose veins, and mild bilateral hearing loss. (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.  The claimant can perform light work as defined in 20 CFR 404.1567(b) subject to the following non-exertional limitations: she can occasionally use ramps and stairs but she cannot use ladders, ropes or scaffolds; she can frequently balance, kneel, stoop, crouch and crawl; she should avoid concentrated exposure to extreme cold and excessively noisy workplace environments; and she cannot work around hazards such as heights or machinery but she is able to avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar, or approaching people or vehicles.

6.  The claimant is capable of performing past relevant work as an administrative assistant because, as performed and as generally performed, this work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from May 31, 2016, through the date of this decision (20 CFR 404.1520(f).

(Tr. 450-64).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh

19

the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Ms. Jones argues the ALJ did not properly evaluate her treating physicians' opinions and, in evaluating Ms. Jones' pain, relied on personal opinion and "played doctor." (Pl.'s Br., ECF #9, PageID 1345). These errors, in turn, resulted in an RFC assessment premised on legal error and not supported by substantial evidence. (*Id.*).

The Commissioner responds that the ALJ's evaluation of the medical opinions was proper and supported by substantial evidence. (Comm'r's Br., ECF #11, PageID 1380-81, 1383). As to the ALJ's pain analysis, the Commissioner again argues that substantial evidence supports the ALJ's conclusions. (*Id.* at PageID 1385-88).

As described below, I find Ms. Jones' arguments to be unavailing, and therefore **AFFIRM** the Commissioner's decision.

## I.  The ALJ properly applied the treating physician rule.

At Step Four of the sequential evaluation, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. § 404.1527(c). Under the regulations applicable at the time Ms. Jones first filed her claim, treating source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).[1] If an ALJ does not give a treating physician's opinion controlling weight, the ALJ must weigh the opinion based on the length and frequency of treatment, the supportability of the opinion, the consistency

---

[1]     Effective March 27, 2017, new regulations replaced the treating physician rule. *See* 20 C.F.R. § 404.150c; *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017).

of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary requirements, the physician's familiarity with other information in the record, and other factors that might be brought to the ALJ's attention. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)-(6). Nothing in the regulations requires the ALJ to explain how he considered each of the factors. *See* 20 C.F.R. § 404.1527(c); *Biestek*, 880 F.3d at 786 ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor."). However, to safeguard a claimant's procedural rights and permit meaningful review, the ALJ must at least explain the ultimate weight assigned to the opinion. *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011).

The ALJ must give good reasons for the weight afforded to a claimant's treating source's medical opinion. 20 C.F.R. § 404.1527(c)(2). Good reasons for giving a treating source's opinion less-than-controlling weight include: (1) a lack of support by medically acceptable clinical and laboratory diagnostic techniques; and (2) inconsistency with other substantial evidence in the case record (including contrary findings in the treating source's own records). *See Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 786 (6th Cir. 2017) ("An ALJ is required to give controlling weight to a treating physician's opinion, so long as that opinion is supported by clinical and laboratory diagnostic evidence [and] not inconsistent with other substantial evidence in the record.") (citing 20 C.F.R. § 404.1527(c)(2)); *Gayheart*, 710 F.3d 365, 376. When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for giving less-than-controlling weight to a treating physician's opinion, remand is appropriate. *Cole*, 661 F.3d at 939; *see also Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (holding that the failure to identify good reasons affecting the weight given to an

opinion "denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record." (internal quotation omitted).

In evaluating Ms. Jones' RFC, the ALJ stated he considered all symptoms and the extent to which they can reasonably be accepted as consistent with the objective medical evidence and other evidence. (Tr. 456). The ALJ reviewed the testimony and the objective medical evidence as follows:

> As noted above in the discussion beneath Finding 3, the claimant has alleged, without objective proof, of having arthritis all over her body including in her toes. In assessing the claimant's residual functional capacity, the undersigned has also considered that the claimant has alleged in reports and her hearing testimony that she suffers from chronic pain throughout her body that sometimes reaches a 10 on a "zero to ten" pain scale. The claimant has specifically alleged that she has pain in her back, neck, legs, hips, right shoulder, wrists, ankles, and toes. In terms of medical treatment, the claimant has used ice and heat to treat her joint pain in addition to medications. She has also received some physical therapy. In terms of work-related limitations, the claimant said she has trouble lifting more than a couple of pounds. She has also said she cannot stand, sit, or walk for prolonged periods. She has also alleged that she has problems reaching and using her hands. She has also alleged that she has problems squatting, bending, kneeling, and climbing stairs. The claimant has also complained of depression and fatigue, and problems concentrating, and problems completing tasks. The claimant has also complained of osteopenia, sleep apnea, migraine headaches, an overactive bladder, and varicose veins.
>
> The claimant's impairments can cause pain in the lumbar region and pain in her hips and right shoulder. The claimant's impairments can also cause depression. However, the undersigned has placed little weight on allegations that the claimant has pain anywhere else, and allegations that she has suffered from disabling pain, and allegations that she has had more than mild limitations with respect to her ability to perform work-related mental activities. This is because there is no evidence that the claimant has arthritis "all over," and because the claimant's back and hip impairments are not such that is reasonable to expect they have caused disabling pain, and because the evidence contains little mental health pathology. In assessing the claimant's residual functional capacity, the undersigned has also placed little weight on the claimant's complaint of having right shoulder pain because the evidence does not establish problems with the claimant's right shoulder that have persisted for 12 continuous months.

*       *       *

The medical treatment the claimant has received since over the last four-plus year period since the May 31, 2016, alleged onset date also do not support the assignment of any additional or greater work-related limitations. To this point, the undersigned notes the there is no evidence the claimant has required frequent, unscheduled visits for management of her symptoms since the May 31, 2016, alleged onset date. The claimant's medical records also do not show that her medications have been unusually adjusted since May 31, 2016. The claimant's medical records also do not mention any significant, adverse medication side effects.

The claimant's activities of daily living also do not support the assignment of any additional or greater work-related limitations. To this point, the undersigned notes again that the claimant's activities of daily living since the May 31, 2016 ,alleged onset date have been relatively full. More specifically, and among other things, the undersigned notes again that the claimant has been able to read, drive, garden, clean, cook, sew, and managing money.

*        *        *

In relation to the claimant's physical functioning, the undersigned notes again that he has placed some weight on the claimant's complaints of having lumbar degenerative disc disease and degenerative joint disease in both hips. In finding that the claimant has been limited exertionally to light work, the undersigned has also placed some weight on the fact the claimant is mildly obese and has varicose veins. The claimant's mild bilateral hearing loss has also prevented the claimant from being able to work in noisy environments.

Otherwise, the undersigned rejects allegations that the claimant's impairments have caused any additional or greater work-related limitations. In this regard, the undersigned notes here that he has found, based on the expanded record, that the claimant can frequently balance, kneel, stoop, crouch, and crawl whereas he previously judged the claimant to only be able to engage in these postural activities occasionally. Influencing the undersigned's newer assessment of the claimant's postural abilities are the opinions of Angela Bucci, D.O., a State agency physician who reviewed this record on November 13, 2019. The undersigned has placed great weight on Dr. Bucci's opinions because he finds that the weight of the evidence concerning the claimant's functioning over the last four-plus-year period since the May 31, 2016, alleged onset date supports them. Indeed, there are relatively few complaints found in the claimant's medical records regarding problems the claimant has had balancing, stooping, kneeling, crouching, or crawling. There are also few objective signs that the claimant has had problems balancing, stooping, kneeling, crouching, or crawling.

The weight of the remainder of the objective evidence in this record also does not support the assignment of any additional or greater limitations. To this point, the

25

undersigned notes the degenerative changes in the claimant's lumbar spine and hips are not such that it is reasonable to expect that they can cause disabling pain. The claimant has also been described on numerous occasions since the May 31, 2016, alleged onset date as having normal physical findings. For example, the claimant was described in August 2016 as not being in any physical distress and as having a normal gait and normal lower extremity muscle strength. The claimant was also described in January 2017 as having normal strength in all four extremities.

A physical exam in March of 2017 noted the claimant had a normal gait, normal reflexes which were symmetric, as well as a grossly intact sensation. She had no joint swelling, deformity, tenderness, and no tender points. In April, x-rays of the lumbar spine showed severe degenerative disc disease L4-5 and mild degenerative disc disease L5-S1. Degenerative facet changes were noted in the lower lumbar spine. No fractures or abnormalities were seen. Notwithstanding the description of the claimant as having severe degenerative changes at the L4-L5 disc space, it is notable that the claimant's back complaints have not been investigated to date with magnetic resonance imaging, a fact that suggests the claimant has not had disabling back problems.

It is also notable the normal physical functioning referenced above has continued into the present. For example, the claimant was described on June 25, 2018, as not being in any physical distress. The claimant was also described as having normal sensation, a normal gait, and normal range of motion of the hips, knees, shoulders, and spine. The claimant was similarly described on October 5, 2018, as having normal musculoskeletal range of motion. The claimant was also described on November 20, 2018, as having a normal gait and normal muscle strength. The claimant was also described on May 16, 2019, as being neurologically intact. The claimant also described herself on June 4, 2019, as not having any joint pain or joint swelling. The claimant was also described on June 4, 2019, as being neurologically intact. The claimant was also described on June 25, 2019, as having a normal gait. The claimant also described herself on October 8, 2019, as being neurologically intact and as having no joint pain.

(Tr. 457-62) (internal citations omitted).

The ALJ also addressed Dr. Jewell and Dr. Damm's opinions together, stating:

The undersigned has also considered, but not given controlling weight to, the opinions of two treating physicians, John Jewell, M.D., and William Damm, M.D. More specifically, both of these sources said the claimant was not capable of performing even a reduced range of sedentary work on a full-time basis. In part, according to these sources, this is because the claimant would need to take up to three hours of breaks during an eight-hour period notwithstanding the other

exertional and non-exertional limitations they described the claimant's impairments as causing.

The undersigned has declined to give controlling weight to Drs. Jewell's and Damm's opinions because the objective evidence referenced in this decision does not support them. In addition, their opinions are not consistent with the opinions of Dr. Bucci, the above-mentioned State agency physician who reviewed this record. Instead of controlling weight, the undersigned affords little weight to Drs. Jewell's and Dr. Damm's opinions. This is because, in both instances, they gave undue weight to the claimant's complaints of having disabling back pain. In addition, the undersigned finds that Dr. Jewell gave undue to the claimant's complaints of having widespread joint pain caused by osteoarthritis in light of the fact there is no objective evidence of an impairment(s) capable of causing widespread joint pain. Therefore, notwithstanding the fact that they had the opportunity to hear the claimant describe herself as having pain everywhere over a longitudinal period of time, their opinions are divorced from the objective evidence.

(Tr. 463) (internal citation omitted).

Ms. Jones claims, "It is unclear and thus error as to what ALJ Kearney meant by reducing evidentiary weight due to the treating physician opinions being 'divorced from the objective medical evidence,'" and the "barebones analysis" does not overcome the treating physician rule. (Pl.'s Br., ECF #9, PageID 1346). To the contrary, it is evident the ALJ declined to give controlling weight to Dr. Jewell and Dr. Damm's opinions because they were not consistent with the objective medical evidence of record. Moreover, the ALJ articulated good reasons for the weight afforded to them. As the Sixth Circuit observed in *Dyer v. Social Sec. Admin.*, 568 Fed. App'x 422, 425-26 (6th Cir. 2014), the opinion of a treating physician may be discounted "where that opinion was inconsistent with other evidence of record or the assessment relied on subjective symptoms without the support of objective findings." Here, the ALJ determined the opinions were inconsistent with other record evidence and, indeed, reading the ALJ's decision "as a whole and with common sense," *Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-89 (7th Cir. 2010), reveals an overwhelming array of consistently normal physical examination findings, including

27

normal gait, normal range of motion in the hips, knees, shoulders, and spine, normal strength, no
sensory deficits, and no joint swelling, tenderness, or deformity. (Tr. 457-62). Moreover, the ALJ
acknowledged the longitudinal relationship between Ms. Jones and her treating physicians but
determined that evidence of Ms. Jones' daily activities, including cooking, cleaning, sewing,
reading, and driving, did not support finding greater work limitations. (Tr. 458).

To show Dr. Jewell and Dr. Damm's opinions were consistent with the objective medical
evidence, Ms. Jones points to medical imaging showing severe degenerative disc disease at L4-L5,
mild at L5-S1, with facet changes and degenerative hip joints, along with other objective findings,
including a positive straight leg raise test, an antalgic gait, tenderness, and decreased range of
motion. (Pl.'s Br., ECF #9, PageID 1347). The greater weight of the evidence, however, reveals
normal objective findings. As noted above, the ALJ's decision cannot be overturned if substantial
evidence supports the claimant's position so long as substantial evidence also supports the ALJ's
position. *Jones,* 336 F.3d at 477.

Ms. Jones next argues that Dr. Jewell and Dr. Damm's opinions should have been afforded
greater weight because they are similar to the opinion of consultative examiner, Dr. Saghafi. (Pl.'s
Br., ECF #9, PageID 1348). However, the ALJ appropriately determined Dr. Saghafi's opinion was
not supported by the objective evidence of record, including Dr. Saghafi's own findings and thus
gave Dr. Saghafi's opinion limited weight. (Tr. 462) (citing to portions of the record showing
normal gait, normal muscle strength in all four extremities, normal sensation, and normal  range
of motion in all joints).

28

I find the ALJ offered good reasons, supported by the record, for affording Dr. Jewell and Dr. Damm's opinions limited weight. In addition to finding no legal error, I find the ALJ's conclusions supported by substantial evidence.

Because the ALJ offered good reasons, that are supported by the record, for the weight afforded to Dr. Jewell and Dr. Damm's opinions, I find the ALJ did not err in discounting them.

## II.  The ALJ did not err in evaluating Ms. Jones' subjective complaints of pain.

An ALJ follows a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ considers all relevant evidence, including:

- a claimant's daily activities;
- the location, duration, frequency, and intensity of pain or other symptoms;
- factors that precipitate and aggravate the symptoms;
- the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
- treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;
- any measures other than treatment an individual uses or used to relieve pain or other symptoms; and
- any other factor concerning the claimant's functional limitations and restrictions due to pain and other symptoms.

20 C.F.R. § 404.1529(c)(3); *see also* SSR 16-3p. The ALJ is not required to analyze all seven factors, but only those that are germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she

considered all relevant evidence."). The ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources. SSR 16-3p.

The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ finds it inconsistent with objective medical and other evidence. *Jones,* 336 F.3d at 475-76. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.,* No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.,* 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review. *Jones,* 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints or the conclusions drawn from them. *Baumhower v. Comm'r of Soc. Sec.,* No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman,* 693 F.3d at 713-14.

Ms. Jones asserts the record largely supports her statements about the disabling effects of her pain because her complaints were consistent and made to multiple physicians of differing specialties and the record contains objective medical evidence consistent with her diagnoses,

including a positive straight leg raise, antalgic gait, tenderness, and decreased range of motion.
(Pl.'s Br., ECF #9, PageID 1352.

Here, the ALJ determined Ms. Jones' impairments could cause pain in the lumbar region,
hips, and right shoulder, but found that her allegations of disabling pain were not consistent with
the evidence of record. (Tr. 457). The ALJ recounted Ms. Jones' hearing testimony:

> The claimant has specifically alleged that she has pain in her back, neck, legs, hips,
> right shoulder, wrists, ankles, and toes. In terms of medical treatment, the claimant
> has used ice and heat to treat her joint pain in addition to medications. She has also
> received some physical therapy. In terms of work-related limitations, the claimant
> said she has trouble lifting more than a couple of pounds. She has also said she
> cannot stand, sit, or walk for prolonged periods. She has also alleged that she has
> problems reaching and using her hands. She has also alleged that she has problems
> squatting, bending, kneeling, and climbing stairs. The claimant has also complained
> of depression and fatigue, and problems concentrating, and problems completing
> tasks. The claimant has also complained of osteopenia, sleep apnea, migraine
> headaches, an overactive bladder, and varicose veins.

(Tr. 457) (internal citations omitted).

The ALJ's subjective symptom analysis focused on the largely normal physical examination
findings. The ALJ explained he placed little weight on Ms. Jones' claims of pain in her neck, wrists,
knees, legs, ankles, and toes because there is no radiological or other objective evidence of
impairment involving those areas and range of motion was normal. (Tr. 451, 457, 462). He placed
some weight on her complaints of disabling back and hip pain, and limited Ms. Jones to light
exertion work, but determined the degenerative changes were "not such that it is reasonable to
expect that they can cause disabling pain." (Tr. 461). The ALJ determined Ms. Jones' claims of
disabling pain were inconsistent with her relatively full activities of daily living (Tr. 458) and
inconsistent with the largely normal physical findings, including normal gait, normal strength in
all extremities, normal reflexes, normal range of motion, and no joint swelling, deformity,

tenderness, or tender points. (Tr. 462). The ALJ also noted Ms. Jones' medications were not unusually adjusted and she denied any significant, adverse medication side effects. (Tr. 458).

The ALJ's evaluation took into consideration several of the factors under 20 C.F.R. 404.1529(c)(3), clearly articulated the weight he gave to Ms. Jones' statements, and reasonably discounted those statements as inconsistent with the objective medical and other evidence. I find no reason to disturb the ALJ's subjective symptom analysis.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: August 8, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE